IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| AUGUST LOUIS WOLF | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| | ) | |
| SAMANTHA MENH | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# **COMPLAINT**

Plaintiff, August Louis Wolf, by counsel, files the following Complaint against Defendant, Samantha Menh ("Menh").

Plaintiff seeks (a) compensatory damages and punitive damages in an amount not less than **$3,350,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from June 14, 2016 to the date of Judgment at the rate of six percent (6%) per year pursuant to § 8.01-382 of the Virginia Code (1950), as amended (the "Code"), and (c) court costs – arising out of Defendant Menh's tortious interference with contract and business expectancies, defamation *per se*, and common law conspiracy.

## I. **INTRODUCTION**

1.     Throughout his life, August Wolf's relationships with women have been characterized by great respect, community, inclusivity, empathy, understanding and empowerment.  A former staffer, friend and confidant – Sarah Jorgensen – described her working relationship with Wolf as follows:

1

> I worked for the August Wolf for US Senate Campaign, from 2/1/16 to 4/17/16.  During that time, I spent a lot of time traveling and in the office alone with August Wolf. At NO point, did I ever feel threatened or uncomfortable with him.
>
> August Wolf was always very professional, level headed, and was more than open to constructive dialogues. Mr. Wolf, and I worked long hours together, mostly on public speaking. Examples: public speaking, answering questions, changing many "words" that were more comfortable and those he used in normal conversations. Public Speaking is harder than most people realize. Mr. Wolf had a few "one liners", his most used being, "I might need to be tasered to stay awake"…He never ever mentioned a body part.
> At, no time during my employment with Mr. Wolf, did he make sexual advances nor spoke with sexual innuendos within my hearing and definitely not towards me or others I was working with.
>
> From prior to my hiring and during my employment, I was Mr. Wolf's confidant. I was involved in every aspect of his Campaign, including things that he was questioning about others, strategies, money, and the hiring of new staff (both times).

Wolf's colleagues and friends know him to be gentle, kind, loving and supportive.

       2.     Defendant, Samantha Menh, is a highly sophisticated political operative who exploits her sexuality to get what she wants from men.  Menh is controlling, combative, jealous, disrespectful and condescending towards women.  Jorgensen accurately describes Menh's character and manners as follows:

> Prior to meeting Ms. Menh, I received 3 emails that I felt were condescending. Calling me, "honey", "busy little girl" and thanking me for still believing in Mr. Wolf. No one calls me "honey", since it is inappropriate and I have a dog with that name. "Busy little girl"?? I was 45 years old, a single mother and am 5'10". Not a little girl. Her thanking me?? This was now the third set of new employees that I had/would be working with.  After, each of the above emails, I asked her to please call me ASAP. She ignored each request.
>
> The first day that I met Ms. Menh, she either closed doors in my face "for meetings" that I had always been included in or had to interrupt and barge in on my meetings with others.
> To the point where Mr. Wolf and I had to go into the kitchen to discuss something of a private employment matter. That lasted about 3 minutes, since she barged,  hit me with the door on my heel and I was cut by door….bleeding.

Menh lied to August Wolf, embellished her accomplishments and misrepresented her connections to a get a job.  Menh aggressively promoted her relationship with Speaker of the House Paul Ryan and his family, for whom she served as a nannie in 2012 during Mr. Ryan's campaign for Vice President.  She concealed from Wolf ongoing sexual relationships and a political promiscuity that was and remains her common plan, pattern and practice.  In 2016, while she was Finance Director and Advisor for the August Wolf For Senate Campaign, Menh sought to obtain money from Wolf by threats and undue

means.  When Wolf refused to be extorted, Menh decided to destroy Wolf's reputation and interfere with his business and employment.  Menh concocted a story about Wolf out of whole cloth.  She falsely and maliciously accused him of sexual harassment and other wrongdoing, which is contrary to the very fiber of August Wolf's being.  In this action, Wolf seeks damages for the injuries inflicted upon him by Menh.

## II.  PARTIES

3.     Plaintiff, August Louis Wolf ("Wolf"), is 57 years old.  He is a proud father of four children, and an Olympian.  Wolf is a citizen of Florida.  He graduated *cum laude* in 1983 from Princeton University, Woodrow Wilson School of Public Affairs.  He holds the outdoor Ivy League Record in shot-put.  He was United States Indoor and Outdoor National Shot-Put Champion in 1984.  He competed on behalf of the United States of America at the 1984 Summer Olympics in Los Angeles, where he placed fourth.  After retiring from competitive sport in 1992, Wolf worked in Silicon Valley and in banking in New York City for over twenty-three (23) years with an unblemished record.  Today, he is a business development consultant for MiT National Land Services.  In 2000, Wolf founded US Athletic Trust, http://usathletictrust.org/, a non-profit providing support and advocacy for America's Olympic athletes.  In 2014, he was named Trustee of the United States Olympic and Paralympic Foundation.  Wolf is also the Founder of Olympians Rising, https://www.olympiansrising.org/, a non-profit project providing support and advocacy for America's Olympic athletes, supporting major reform of the United States Olympic Committee (USOC), and rebuilding the U.S. Olympic program from the ground up.  Wolf has had several op-eds published in national and international media outlets about this reform effort, including the following:

The Wall Street Journal
USA Today
The Washington Post
Frankfurter Allgemeine (Germany)

In 2016, Wolf sought the Connecticut Republican Party's nomination to run against Democrat Richard Blumenthal for United States Senate.  Although widely considered the favorite to win a contested primary in August 2016, Wolf was denied ballot access to the primary because of false accusations made and unfounded litigation commenced by Menh.  On June 14, 2016, Menh's statements and the attendant negative publicity and false light also forced Wolf to resign from his position as managing director of Lebenthal Asset Management, a position he held for many years.   Until publication and republication of Menh's false and defamatory statements at issue in this action, Wolf enjoyed an untarnished reputation. [https://www.nytimes.com/1981/06/05/sports/wolf-of-princeton-has-large-talents.html].

4.        Menh is a citizen of the District of Columbia.  She is a political operative and extortionist, who uses sex as leverage to ingratiate and inveigle herself into political campaigns and the lives of donors and politicians where she is paid.  Federal Election Commission ("FEC") records show that Menh currently works as a "fundraiser" for the "Great America" Political Action Committee (PAC) in Alexandria, Virginia.   Great America PAC is the premier Pro-Trump Super PAC, founded by Republican Pro-Trump Operative, Dan Backer.  In her current fundraising position, Menh, upon information and belief, works closely with Cabinet level persons and others in the Republican Party.  In March 2016, August Wolf for Senate ("AWFS") hired Menh as Finance Director and Advisor to help the candidate qualify for the 2016 Connecticut Senate Republican Primary on August 6, 2016.  Because of Menh's misrepresentations about her credentials,

including her relationship with Speaker of the House Paul Ryan, AWFS agreed to pay Menh a handsome salary of $7,500 per month.  Menh voluntarily resigned after six (6) weeks of truly outrageous behavior, which included an unannounced, week-long trip to see Speaker Ryan and multiple sexual relationships with different men.  Two months after she resigned, Menh was paid $11,000 by the George Washington Leadership Foundation ("GWLF")[1] for commencing and prosecuting unfounded litigation against Wolf, falsely and outrageously accusing him of sexual battery, sexual harassment, crimes, and other misdeeds.  Between 2016 and the present, Menh, acting in concert with certain political operatives, interfered with Wolf's business and employment and repeatedly defamed and disparaged Wolf.  Wolf brings this action to clear his name and expose Menh's wrongdoing.

### III.   JURIDICTION AND VENUE

5.   The United States District Court for the Eastern District of Virginia has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

6.   Menh is subject to personal jurisdiction in Virginia pursuant to Virginia's long-arm statute, § 8.01-328.1(A)(1), (A)(3) and (A)(4) of the Code, as well as the Due Process Clause of the United States Constitution.   She engages in continuous and systematic business in Virginia.  She regularly does and solicits business in Virginia.  She

---

[1]   Between August 26, 2016 and September 27, 2016, Menh received two (2) payments directly from GWLF's bank account in Chantilly, Virginia, totaling $11,000. [https://www.opensecrets.org/pacs/expenditures.php?cycle=2016&cmte=C00623769]. GWLF is based in Alexandria, Virginia.  GWLF's treasurer is Dan Backer ("Backer"), a leading operative at Great America PAC, where Menh now works.

has minimum contacts with Virginia such that the exercise of personal jurisdiction over her comports with traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

7.      Venue is proper in the Alexandria Division of the United States District Court for the Eastern District of Virginia.  Menh's tortious interference and conspiracy occurred in part in Alexandria, Virginia, and caused substantial harm to Wolf's personal and professional reputations in Virginia.  A substantial part of the events giving rise to the claims stated in this action occurred in the Eastern District of Virginia.

## IV.  STATEMENT OF THE FACTS

**A.**      ***The Problems With Menh***

8.      Menh is 29-years old. She graduated from Hooker High School in Hooker, Oklahoma, in 2007.  Menh was active in the adult entertainment/escort business for several years after high school.  Nude photographs of her remain on the Internet.  When questioned about her elicit past in late 2017, Menh begged that it not be publicized in any way.    Menh now describes herself as a self-employed "Political Consultant". [https://www.linkedin.com/in/samanthamenh/].  Over the years, she has been paid by multiple different political action committees (for whom she does little or no real work) including The Townsend Group (for undisclosed "services"). [*See, CAL VICTORY 2018 FEC FILING)*].  In this case, Menh was paid to fabricate stories about Wolf and to publish those stories in an unfounded lawsuit, the purpose of which was to destroy Wolf's reputation.  Menh acted with callous and wanton disregard for Wolf's rights and interests and with no regard for the impact of her actions upon Wolf, his family and/or his children.

9.      In 2016, prior to being hired by AWFS, Menh worked for an activist and advocacy group funded by David H. Koch and Charles Koch, known as Americans For Prosperity ("AFP"). [https://americansforprosperity.org/].   Menh worked in AFP's Virginia office, but had, as one of several development territories, Ohio.   In 2015, unbeknownst to Wolf, Menh met John Baylor Myers ("Myers"), AFP's Central Ohio Field Director. [https://www.facebook.com/baylor.myersafp].   Myers worked on the Romney Presidential Campaign.  Myers and Menh had a sexual relationship at that time. Myers left AFP in late 2015 and became the campaign manager for a Congressional candidate who placed fourth in a primary in Representative John Boehner's former district.   [http://www.courant.com/politics/capitol-watch/hc-august-wolf-announces-new-campaign-team-20160331-story.html].

10.     Wolf met Menh in July 2015 at AFP's 2015 Summit in Columbus, Ohio. Menh held herself out to Wolf as an aggressive, principled fundraiser who was able to raise money from conservative donors.  Menh represented that she was very close to Speaker of the House Paul Ryan and his family, including wife Janna Ryan, and sisters from Oklahoma [see, e.g., https://newsok.com/article/3710163/janna-little-ryan-was-raised-right-in-a-small-oklahoma-town-friends-and-sister-say] whom Menh claimed introduced her to Paul Ryan and his immediate family.

11.     In March 2016, AWFS hired Menh to be Finance Director and Advisor. Menh's job was to raise money for AWFS.  Instead of diving into her job as AWFS' Finance Director, Menh spent the first ten (10) days on the job in Virginia negotiating a settlement to prevent AFP from being sued for sexual harassment.

12.     Menh's job performance was abysmal.  In April 2016, Menh verbally committed to a target of $100,000 for the second quarter ending June 30, 2016, but actually was responsible for raising less than $10,000.  After four weeks on the job and several requests, Menh finally produced a boilerplate fund-raising plan.  She came nowhere near meeting even her own targets.

13.     Menh recruited Baylor Myers to join AWFS as campaign manager.  Menh concealed from Wolf the fact that she and Myers had had and/or were having a sexual relationship.  Although Myers was a capable political operative, Menh's manipulation of him and sexual schemes with others put the AWFS Campaign into total chaos.  In or about mid-April 2016, Menh disclosed to Wolf that Myers had professed to her that he (Myers) was in love, and that she had rejected him.  When Wolf asked Myers about this, Myers claimed that the relationship was casual – only "making out" – and that Menh had become very difficult of late.  As a result of their undisclosed sexual relationship, the working relationship between Menh and Myers continued to deteriorate through May 2016, and as a result, so did the AWFS Campaign.

14.     While dating AWFS' Campaign Manager Myers, Menh carried on multiple other sexual relationships.  Menh spent a night in New York City with Republican strategist, Nicolas David Muzin ("Muzin"), a controversial operative (advisor/bundler to Senator Ted Cruz) with ties to Qatar.  Muzin is a partner at Stonington Global, a lobbying and consulting firm that helps "investors, including Service sovereign wealth funds, find opportunities in the United States and abroad." [https://www.stoningtonglobal.com/about.html].  Menh began a sexual relationship with Muzin that would last months.  Menh's affair with Muzin ended her relationship with

Myers.  Menh continued her affair with Muzin, even after her resignation from AFWS.

Myers eventually resigned from AWFS to work for the TRUMP 2016 campaign and now

the Trump Administration.  He now works in a senior role in the Treasury Department

under former TRUMP 2016 Finance Director Eli Miller, who hired Myers from AWFS.

15.     In addition to lack of fund-raising efforts on behalf of AWFS and skill,

and amid her ongoing affairs and exploits with Myers and Muzin, Menh took an

unauthorized week off in March/April 2016 and traveled to Janesville, Wisconsin,

allegedly to "babysit" Speaker Paul Ryan's children.  In the fall of 2016, after publication

of Menh's false accusations, Wolf attempted to contact Speaker Paul Ryan regarding

Menh.   Wolf's counsel sent a certified letter that was signed for, requesting an

opportunity to discuss Mr. Ryan's relationship with Menh.   In addition, a friend and

major donor of Speaker Ryan called Mr. Ryan's scheduler, Maureen Mitchell, relayed the

narrative of Menh's false accusations and asked Ms. Mitchell to have Speaker Ryan

return her call.   Speaker Ryan did not respond to either the call or the letter from

counsel.[2]

16.     Throughout her six (6) +/- weeks as Finance Director and Advisor to

AWFS, Menh engaged in repeated sexual extortion attempts, including the following:

a.       Menh attempted to seduce Wolf's opponent, Jack Orchulli

("Orchulli"), a 70-year old, wealthy businessman who has run unsuccessfully ran for

statewide office several times.  According to a former AWFS staffer (Sarah Jorgensen),

who decided to quit due to Menh's abuse, Orchulli was sexted repeatedly by Menh.  On

---

[2]       When Wolf interviewed Menh for the position of AWFS' Finance
Directors, Menh claimed that she had a "close personal relationship" with Speaker Ryan.
Wolf did not delve into the nature of that "relationship" at the time he hired Menh.

April 29, 2016, Menh asked Orchulli to give her a ride to her apartment.  What happened

is unclear to Wolf, but the next day Orchulli called Wolf and asked Wolf if Menh still

worked for AWFS.  When Wolf said, "yes", Orchulli said that he would "bury" Wolf,

and hung up.  Wolf later learned that Menh had also bad-mouthed Jorgensen to Orchulli.

Jorgensen disclosed:

> A day later, while driving to an event, Mr. Orchulli told me that Ms. Menh had told him that (I) Sarah Jorgensen, was a liar, drug addict and not someone who he should have working for him. I was devastated, and quite distraught over Ms. Menh's untruths.

   b.   On April 20, 2016, in a conversation with erstwhile lover and

AWFS Campaign Manager, Myers, Menh attempted to suborn his perjury.  Menh asked

Myers to confirm that Wolf had engaged in sexual harassment and misconduct, which

Myers refused to do.

   c.   On the night of May 9, 2016, after the 2016 Connecticut

Republican Convention Menh "hooked up" (her own words) with the Chairman of the

CT-GOP, J.R. Romano ("Romano"),  https://www.gop.com/leaders/state-chairman-jr-

romano-ct/, in a hotel room at the Radisson Hotel paid for unlawfully with Wolf's

personal credit card.  Menh used the personal credit card to pay for more than a dozen

drinks for her, Myers and Romano, and then the hotel room in which she "hooked up"

with Romano, without authorization (the entire AWFS staff drove home after the

Convention, including Wolf).  Myers, Menh and Romano had all previously worked at

AFP.  That late evening of the GOP Convention (May 11, 2016), Myers, Menh and

Romano were all in Romano's SUV in front of the Radisson Hotel.  Menh and Romano

were making out in the back of the SUV.  Menh who had been having an affair with

Myers a week earlier asked Myers to leave the SUV.  Menh later bragged about sleeping with Romano that night.

17.     On May 9, 2016, AWFS was blocked from getting on the primary ballot at the Connecticut GOP Convention by insiders, making the further viability of the AWFS Campaign questionable.  AWFS declared that it would try to collect the required 8,079 signatures needed to get on the ballot from registered republicans.

18.     On May 12, 2016, Menh violated FEC rules on "coordination" by soliciting a $100,000 donation for a PAC from an AWFS donor.  Menh solicited the donation exactly four (4) hours after meeting the donor at a dinner.  She texted the donor after dinner, visited the donor at his hotel bar, then went to his room, had sex, and encouraged the donor to contribute $100k+.  Menh disclosed her plans to sue Wolf for sexual harassment (see below) shortly after the $100,000 wire (to pay for independent gathering of petition signatures) was received by the PAC.

19.     Although she was Finance Director and Advisor, in May 2016 Menh started to become more and more vocal about how the AWFS Campaign was being run by Campaign Manager and former lover, Myers.  Never – in any of her complaints – was *anything* said by Menh about Wolf's behavior.  Menh began to publish her complaints about how the campaign was being run to people outside of AWFS' staff.  This alarmed Wolf.

20.     On May 16, 2016, Wolf spent most of the afternoon with Menh working on her role going forward and her plans to raise money for the primary.  Wolf and Menh had a late work dinner at a diner.  Because AWFS could not afford more staff changes at

the critical end period of the Campaign, Wolf encouraged Menh to work productively to support AWFS.

21.     When Wolf got home that evening, he met with Myers in his dining room (Myers was temporarily staying at Wolf's home).  They had a meeting and discussed several issues, including whether Menh needed to focus on fundraising exclusively.  During the meeting, Menh texted Wolf who replied that he would call her back.  When Wolf did call her, Menh immediately accused Wolf of conspiring with Myers against her.  Wolf denied any such conspiracy.  Menh hung up.  At 11:47 p.m. that evening, Menh emailed Wolf to say that she was resigning, citing actions of Myers.  Menh's email did not mention anything about sexual harassment or any other wrongdoing by Wolf.

22.     For the next two days, Wolf continued to attempt to get Menh to withdraw her offer to resign and to refocus her efforts on the Campaign.  As Myers did not alert Wolf to Menh's extortion plot (hatched on April 20, 2016) until six months later, Wolf was oblivious to the fact that he was about to be extorted by Menh.  On May 18, 2016, Menh submitted a letter falsely stating the following:

> Mr. Wolf,                                                   May 18, 2016
>
>         On April 20, 2016, I complained to you that I found your repeated sexual harassment of me and your creation of a sexually charged environment intolerable.  Since that time, you have gone out of your way to retaliate against me for complaining.  Today, you tried to intimidate me by physically blockading my departure from the office with your body (you are a 6'6" and I am 5'2").  You have created such a hostile environment that no reasonable person could continue to work in this environment and I consider myself constructively discharged.
>
>         Additionally, you have repeatedly violated campaign finance laws and you have violated Connecticut law by failing to comply with its petition rules regarding registered Connecticut Republican voter witnesses.  My complaints to you about these repeated violations of public policy have gone unheeded, and indeed you have retaliated against me when I bring them to your attention.
>
>         Thus, although you stated today that I resigned, given that you created such a hostile work environment, I consider myself constructively discharged.

**B.**     *The Unfounded Litigation*

23.     Five (5) minutes into the discussion about accepting her resignation, Menh had an employment attorney on speakerphone threatening AWFS with a $160,000 lawsuit.  This came as a great shock to Wolf, who was completely unaware that Menh's letter and the threatened litigation was part of an extortion scheme.

24.     Shortly after she resigned on May 18, 2016, Menh produced a lawsuit.  In subsequent emails the next week, Menh's attorney threatened to file the lawsuit (that included several pages of baseless allegations of battery, sexual harassment and other wrongdoing) and to publicize the false accusations with the help of a progressive news aggregator site, unless Wolf paid Menh money.

25.     Menh's complaint was completely unfounded.  She falsely portrayed herself as a "damsel in distress".  As she did with Jorgenson, Menh sought to exploit her height and the fact that she was a "young lady".  Menh chose words that were calculated to portray herself as a "victim", when, in truth, she was the aggressor and engaged in a scheme to extort money from Wolf – a scheme that she admitted to Myers and that Myers later disclosed to Wolf in a taped conversation.

26.     Menh's complaint contained wildly baseless, hurtful and offensive allegations without any evidentiary support, including the following:

> 10.     After plaintiff joined the Campaign, she immediately began noticing that candidate Wolf engaged in sexually improper and abusive behavior and that he was not abiding by federal and states laws regarding financial reporting and seeking signatures on his petition.  His inappropriate sexual comments and behavior were severe and pervasive. Plaintiff is a young lady in her mid twenties.  Wolf is in his fifties.

11. Amongst the many examples of his sexually harassing conduct were these:

a. Wolf repeatedly called plaintiff, "babe" and she invariably corrected him and reminded him that her name was Samantha.

b. When plaintiff first joined the campaign and was talking to Wolf about his interests she asked him what he did for fun and he responded, "I have sex!"

c. His mind always in the gutter, one time Wolf asked plaintiff whether she was sleeping with the campaign manager.

d. Wolf asked plaintiff is she "has ever been sexually satisfied by a real man?"

e. Wolf reminded plaintiff that she was staying in an apartment paid for by the Campaign and that he could get into her apartment at any time. He dangled and waved her apartment keys in front of her face, while he said "I know who comes in and out of your apartment because I have the keys!"

f. Wolf made inappropriate comments like "When I am in the U.S. Senate, someone should put a taser on my dick so I can stay awake."

g. While Campaign staff members were driving to a fundraising event with Wolf in the backseat with his girlfriend, the two of them were groping each other and making out, and he then put the girlfriend's head in his lap.

h. Wolf constantly was touching the plaintiff, which she felt was creepy, and she continuously told him, "don't touch me."

Menh further falsely accused Wolf of the following:

i. On plaintiff's last day of work, the Wolf barricaded plaintiff in her office with his 6'6" body and would not let her walk out of the room. Plaintiff is 5"2" young lady and repeatedly asked Wolf to let her leave the room as she felt unsafe with him in there. He would not let her leave, so she got on her cell phone and made a call to report what was going on contemporaneously so that he would realize that someone on the outside world would be a witness to his inappropriate and unprofessional conduct.

j. Wolf used highly sexualized and offensive language, referring to his former staffers as "just a bunch of gay lovers circle jerking each other."

k. Given that the tone is set from the top down in organizations, soon Wolf's campaign manager, Baylor Myers, started to join in, making highly inappropriate comments. For instance, Baylor Myers called plaintiff a "woman of the night," said he loved her, that he wished he could wake up with her, and he continuously asked plaintiff out on a date. Baylor texted her that she was "a beautiful distraction." One time he texted her "Sleepover?" to which plaintiff responded "Are you out of your mind?" He also made highly offensive racist remarks about African Americans.

l. Both Wolf and campaign manager, Baylor Myers, disrespectfully and obscenely referred to the Connecticut Republican House minority leader, Themis Klaridis as "Clitoris."

m. On one occasion when Wolf, his girlfriend Jessica, and the campaign manager and plaintiff were going out to dinner to discuss how to involve Jessica in the campaign, Wolf lasciviously asked plaintiff, "But the question is…who is going to end up with who at the end of the night?"

15.   Exhibiting signs of arrested development and sexual insecurity, Wolf constantly talked about sex and his penis and the penis size of others, creating a hostile environment for the campaign workers.

19.   Plaintiff objected to the pervasive use of sexually charged language in the workplace and complained to Wolf and the campaign manager about Wolf's inappropriate sexual conduct, and let them both know how uncomfortable she felt with his puerile sexual references, harassment and conduct. She told him that he had created an intolerable sexually hostile work environment.

20.   Thereafter, Wolf retaliated against plaintiff, as described further below.

21.   In addition to Wolf's improper conduct in creating a sexually hostile working environment, he and his campaign also were involved in a pattern of repeated financial improprieties and violations of state and federal election campaign laws.

28.   Plaintiff texted both the candidate and the campaign manager, stating that she was not comfortable with their loose interpretation of the law.  Later that same day, Wolf blockaded plaintiff in an office with his body blocking the door.  Plaintiff stated that she wanted to talk to seek legal advice about what he was doing.  Wolf insisted that she give him her computer so that plaintiff could not use what was on there as evidence.  Plaintiff, who is 5'2", was physically intimidated by 6'6" Wolf, who was physically blocking her exit and barricading her in her office.  Plaintiff then realized she could not work there any more under such hostile, illegal and physically intimidating circumstances.

31.     Given the sexually harassing and hostile work environment, the illegal fundraising, the illegal petition drives, the violation of campaign finance laws, and the retaliation, the atmosphere of the workplace was so severely and pervasively hostile that no reasonable person could continue to work there.  As a consequence, plaintiff was in effect constructively discharged and left the Campaign on May 18, 2016.

27.     The timing of Menh's threats and false accusations – never once mentioned prior to May 18, 2018 – was intentional.  Menh threatened Wolf with the lawsuit at a time when Menh believed that Wolf would pay her extortion demands.  The AWFS Campaign was in the final stages of collecting signatures to get on the primary ballot.  Menh knew that a lawsuit under these circumstances with such scandalous allegations would destroy the Campaign that carried Wolf's name.

28.     After Wolf refused to succumb to Menh's demands, Menh emailed the lawsuit to the media broadly.  Sadly, it became front-page news, *e.g.*:





Wolf was devastated.  Publication of the lawsuit to the media irrevocably and irreversibly damaged Wolf.

29.     In article after article, the press simply repeated Menh's false accusations as if they were true. [*See, e.g.,* http://bipartisanreport.com/2016/06/02/connecticut-gop-candidate-faces-lawsuit-after-frequently-discussing-his-penis-with-co-worker/ ("Connecticut GOP Candidate Faces Lawsuit After Frequently Discussing His Penis With Co-Worker")].  This caused Wolf immense personal and professional distress.

30.     To mitigate the damage caused by Menh's calculated publications, Wolf issued the following statement:

> "I was shocked and appalled by the outrageous claims made in this lawsuit. I did not and would never engage in this type of behavior and neither would anyone on the campaign. The allegations are completely baseless. They are an obvious attempt by a former contractor to extort money at a critical time in the campaign, which she did over the last 5 days. I'm not going to tolerate it. I am going to defend this vigorously. It is no coincidence that the attorney representing Mrs. Menh is a democrat operative and fundraiser. It shows the lengths the Democrats will go to stop me from beating Richard Blumenthal. All of them are completely baseless. The allegations concerning fundraising and signature collection are ridiculous The campaign has followed the letter of the law in respect to fundraising and petitioning. Any claims to the contrary are untrue. The reality is Mrs. Menh was struggling in her work due to poor organizational skills, reckless decision making, and unethical professional and personal behavior. We attempted to resolve these issues and keep her on the staff, yet she voluntarily tendered her resignation. We engaged Ms. Menh with great hopes; we are very sad to see it end this way."

31.    After she leaked and published the fraudulent lawsuit to the press and others, Menh filed her complaint in a Superior Court in Connecticutt and commenced sham litigation.

32.    As a result of the publicity caused by Menh's unfounded accusations, AWFS was forced to suspend Wolf's Senate campaign, causing substantial economic loss, insult, humiliation, embarrassment and injury to Wolf's reputation.

33.    In addition to the emotional distress, anxiety and personal injury she caused, Menh's actions also cost Wolf his job (at a time when he had three children in college). On June 14, 2016, Wolf was terminated as Managing Director of Lebenthal Asset Management due to the reputational risk caused by Menh's unfounded litigation

and false accusations. Wolf suffered enormous financial loss.  Because of Menh's false accusations, Wolf has been unable to secure a comparable position, nor borrow funds for a home purchase, nor generally work for publicly-traded companies.  This has forced Wolf to live of his 401K.

34.     Menh's lawsuit named Wolf, Myers and AWFS as defendants.

35.     Shortly after Menh publicized her lawsuit, Myer's attorney, Mark Weaver, an attorney and senior Republican operative in Ohio, stated publicly that "***Mr. Myers and Ms. Menh worked together at a previous employer, before either came to Connecticut. Well before they worked for the Wolf campaign, they had a romantic relationship that was essentially ended by Mr. Myers.  At trial, we will present evidence that Ms. Menh had planned to quit her job with that previous employer and bring a false claim of sexual harassment to leverage a settlement.  The allegations made in this lawsuit are false and we can prove it.***"

36.     After Menh resigned, Wolf learned more disturbing and egregious facts about Menh's misrepresentations and misconduct, including:

a.     Myers informed Wolf that on April 20, 2016, three weeks before Menh resigned, she offered Myers ½ of a settlement she would get from Wolf after threatening Wolf with a sexual harassment suit.  Menh told Myers that he would have to back up her claims.  As the charges were fabricated, Myers declined.  Myers' taped confession demonstrates that Menh's actions were pre-meditated and malicious.

b.     Wolf learned that Menh had been arrested for DUI in Oklahoma, and had then had an affair with the arresting officer.  Wolf received the following Facebook messages from the arresting Oklahoma officer's ex-wife:



NOV 20, 6:51 AM

I don't know if you read these, but Ms. Mehn has a habit of sleeping with law officials to try to reduce DUI TICKETS and after broken marriages- mine she leaves. Wishing your family a stronger unit than mine was when she came between us to get what she wanted.

NOV 20, 8:22 AM

Can we talk today ____? I appreciate you reaching out. August

Absolutely, she along with my ex husband have just been recently turned into internal affairs here in Oklahoma. I have waited a very long time for Oklahoma to enforce the law that was broken. I was shocked when that story came across my newsfeed this morning.

860-_____. She is a very sick woman. I hope to have the truth exposed in our suit so people know what she is about.

Can u send me the link to the story that came across newsfeed?

Yes she is. I hope that you have success in proving that she uses her sexual image to obtain what she wants. I'm not sure if she has them all off the

c.    Most disturbing of all, Wolf learned that Menh was a call girl. Internet research in 2017 uncovered several nude pictures of Menh that were still posted on websites, including the following photograph (redacted below the neck), on a site called "Pretty Babes with Lovely Tits":



37.     **After Menh published her lawsuit, members of the AWFS staff stepped forward and voluntarily offered sworn statements that totally refuted Menh's false claims**.   Connor McGuinness ("McGuiness") was hired as Assistant Director of Finance under Menh on April 25, 2016.   McGuiness reported to Menh and spent almost every day working directly with her and in her presence.   Not once did McGuiness ever see Menh and Wolf ever have so much as a negative word to say about each other.   McGuiness signed an Affidavit that confirmed the following facts:

In my tenure, I never once saw any sort of inappropriate interaction between Ms. Menh and Mr. Wolf. I never once saw Mr. Wolf intimidate Ms. Menh, nor did I hear Mr. Wolf make sexually suggestive remarks. Never in any of my interactions with Ms. Menh did she mention concern about any sort of problem with Mr. Wolf. In fact, Ms. Menh seemed quite happy with the campaign until her resignation. Upon Ms. Menh's resignation I reported directly to Mr. Wolf, and again experienced no inklings of inappropriate behavior, in fact I had an excellent relationship with Mr. Wolf, as did the two staffers who worked under me until the close of the campaign, both of whom are women.

38.    Sarah Jorgenson signed a statement that confirmed the following facts:

Prior to meeting Ms. Menh, I received 3 emails that I felt were condescending. Calling me, "honey", "busy little girl" and thanking me for still believing in Mr. Wolf. No one calls me "honey", since it is inappropriate and I have a dog with that name. "Busy little girl"?? I was 45 years old, a single mother and am 5'10". Not a little girl. Her thanking me?? This was now the third set of new employees that I had/would be working with. After, each of the above emails, I asked her to please call me ASAP. She ignored each request.

The first day that I met Ms. Menh, she either closed doors in my face "for meetings" that I had always been included in or had to interrupt and barge in on my meetings with others.
To the point where Mr. Wolf and I had to go into the kitchen to discuss something of a private employment matter. That lasted about 3 minutes, since she barged,  hit me with the door on my heel and I was cut by door....bleeding.

I was asked by Mr. Wolf and our new Treasurer Jack Pascal to go through desks and boxes to find financial and employment documents that he would need. Mr. Pascal and I started a "bin" for things that he would need and when we were done, he asked me to put in his and Mr. Wolf's office. After doing so, Ms. Menh, goes into their office and is taking it into her own. I said that Mr. Pascal specifically asked that it stay where we put it. Ms. Menh completely ignored me, was about to put the bin in her office when Mr. Pascal came out and told her to put it back, since nothing in there was her business. (Earlier in the day she was trying to go through all of the personnel files, including my own.)

As I was leaving that day, I pulled Baylor Myers, new campaign Manager aside. I told him that Ms. Menh, should never be alone with Mr. Wolf, to move Mr. Wolf's office back to where it was (all windows) and that I felt that Ms. Menh was a lawsuit waiting to happen. With all of her winks, and sexual innuendos that day. I also called Mr. Pascal and Greg Menz stating the same thing to them both. Mr. Pascal, as a cousin of Mr. Wolf's, I asked him to please speak of my concerns with Mr. Wolf.

Soon after, I resigned from the Wolf Campaign. The number one reason, was Ms. Menh, I did not trust her and she was blocking my attempts to speak with Mr. Wolf.

After I left, I started working for Jack Orchulli. A few days into my working for Mr. Orchulli, Ms Menh "apparently had just been fired by Mr. Wolf and needed Mr. Orchulli to drive her home". Mr. Orchulli called me after dropping Ms. Menh off. He was going to fire me because of something that Ms. Menh had said.

Ms. Jorgensen further stated:

I convinced Mr. Orchulli to please wait and call Mr. Wolf to verify that he had "fired her". Mr. Orchulli called Mr. Wolf. Mr. Wolf said that Ms. Menh had not been fired.

A day later, while driving to an event, Mr. Orchulli told me that Ms. Menh had told him that (I) Sarah Jorgensen, was a liar, drug addict and not someone who he should have working for him. I was devastated, and quite distraught over Ms. Menh's untruths.

The reason that I am writing this is because, I read her accusations against Mr. Wolf. I was beyond shocked and also couldn't believe her audacity to claim many of things that she had done to me while I was working with her, against Mr. Wolf. Along, with the outrageous accusations of sexual innuendos, sexualizing his comments, bullying and knowing that Mr. Wolf would never say or do what she claims.

Sincerely,

Sarah Jorgensen
July 19, 2017

39.     The donor, who Menh seduced and slept with on May 12, 2016, confirmed the following:

> During the dinner, as well as our time at the hotel bar and in my room, and also while I drove her to her apartment in the morning, Ms. Menh never mentioned anything negative about August Wolf. In fact, everything she said was very supportive of his efforts and character, as well as the possibility of his winning his campaign. She continued to advocate for Mr. Wolf and for my supporting his campaign.

40.     Menh's false accusations of sexual battery, sexual harassment and other crimes have been republished over and over and over, including many times within the last year.  For instance, as a result of Menh's extortion and vengeful acts, Wolf's name appears on a "Creep Sheet", an ultimate humiliation to Wolf:



[https://www.creepsheet.com/accused/augie-wolf/].  And, lawyers are still trying to make money advertising their services based upon Menh's false and unfounded accusations. [*See, e.g.,* http://www.mayalaw.com/2017/11/20/throwback-news-connecticut-politician-faces-sexual-harassment-claims/ ("Throwback News: Connecticut Politician Faces Sexual Harassment Claims" – published November 20, 2017)].

## COUNT I – <u>TORTIOUS INTERFERENCE WITH CONTRACT</u>

41.     Wolf restates the allegations in paragraphs 1 – 40 above, and incorporates them herein by reference.

42.     At all times relevant to this action, Menh knew that Wolf had a contract of employment with Lebenthal Asset Management as Managing Director.  As part of her duties as Finance Director and Advisor, Menh familiarized herself with Wolf's employment and educational background.  Wolf's employment with Lebenthal was also a matter of public record. [https://en.wikipedia.org/wiki/Augie_Wolf].

43.     Menh intentionally interfered with Wolf's contract, property rights and business expectancies by, *inter alia*, devising and orchestrating a scheme to extort, defame and injure Wolf by fabricating accusations of battery, sexual harassment and wrongdoing, by extorting Wolf and by proceeding with unfounded litigation.  Menh's improper methods, actions and practices were, *inter alia*, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, and sharp.  Menh intended to create adverse publicity for Wolf and to cast him in a false light in order to extort money and concessions from Wolf that were not due to Menh.  Menh acted consciously with spite and ill-will towards Wolf and with reckless disregard for Wolf's rights and interests.

44.     On June 14, 2016, Lebenthal advised Wolf that, because of Menh's false accusations, Wolf posed a reputational risk to the firm.  Lebenthal requested that Wolf voluntarily resign from the firm, the equivalent of termination.  In several subsequent job search interactions from the fall 2016 until today, prospective employers have declined to offer Wolf jobs due to the public sexual harassment allegations by Menh.  The stress and discomfort to Wolf cannot be ignored.  Not a week goes by without Wolf having to defend himself or explain the context of the claims, that are widely circulated online.

45.     As a direct result of Menh's tortious interference with contract and valid business expectations, Wolf suffered personal and professional damage and loss, including, without limitation, loss of employment, injury to his property and business, damage to reputation, prestige and standing, court costs, and other damages in an amount to be determined by the Jury, but not less than $3,000,000.00.

## COUNT II – **DEFAMATION *PER SE***

46.     Wolf restates the allegations in paragraphs 1 through 45 above, and incorporates them herein by reference.

47.     Menh published to third-parties – including, without limitation, media outlets, PACs and political operatives in Virginia, and others – numerous false factual statements, which are detailed verbatim above, of or concerning Wolf.

48.     By publishing her nefarious, false statements to the media and to political operatives in Virginia, Menh knew or should have known that her defamatory statements would be republished over and over by third-parties to Wolf's detriment.  Republication was the natural and probable and intended consequence of Menh's actions and was actually and/or presumptively authorized Menh.  Menh is liable for the republication of

the false and defamatory statements by third-parties within the past year under the doctrine announced by the Supreme Court of Virginia in *Weaver v. Home Beneficial Co.*, 199 Va. 196, 200, 98 S.E.2d 687 (1957) ("where the words declared on are slanderous per se their repetition by others is the natural and probable result of the original slander.").

49.     Menh's false statements constitute defamation *per se*.  The statements accuse and impute to Wolf the commission of numerous crimes involving moral turpitude and for which Wolf may be punished and imprisoned in a state or federal institution.  The statements impute to Wolf an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment.  Menh's statements also prejudice Wolf in his profession or trade.

50.     Menh's false statements have permanently and irreparably harmed Wolf and his personal and professional reputations.

51.     Menh knew that her statements were false and acted with actual malice and reckless disregard for the truth for the following reasons:

a.      The statements were made as part of a scheme to extort money from Wolf.

b.      Menh intentionally set out to destroy Wolf with falsehoods.  The false statements were published to the media and political operatives, such as GWLF and Backer [https://www.political.law/dan] in Virginia in retaliation and reprisal for Wolf's refusal to pay the sum unlawfully demanded by Menh.

c.      Menh's statements were knowingly false, with not a shred of supporting evidence.  She never once spoke or wrote about sexual harassment or any

impropriety by Wolf, until she decided to use these false accusations to extort Wolf.  She knew that there were no crimes committed by AWFS or Wolf and that there was no basis to suggest that Wolf had committed any crimes.

       d.     Menh chose to manufacture and publish false and scandalous statements and use unnecessarily strong and violent language, disproportionate to the occasion.  She expressed her clear and convincing feelings of ill-will and animus towards Wolf.

       e.     Menh did not act in good faith because, in the total absence of evidence, she could not have had an honest belief in the truth of their statements about Wolf.

       f.     Menh accepted money from PACs and political operatives to reiterate, repeat and continue to republish her false defamatory statements out of a desire to hurt Wolf and to permanently stigmatize and destroy him.

52.     Menh lacked reasonable grounds for any belief in the truth of her statements and acted negligently in failing to determine the true facts.

53.     As a direct result of Menh's defamation, Wolf suffered substantial personal and professional damage and loss, including, but not limited to, presumed damages and actual damages, loss or injury to business, pain and suffering, emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, injury to reputation, prestige and standing, costs, expenses and out-of-pocket loss in an amount to be determined by the Jury, but not less than $3,000,000.00.

## COUNT III – <u>COMMON LAW CONSPIRACY</u>

54.     Wolf restates the allegations in paragraphs 1 through 53 above, and incorporates them herein by reference.

55.     Beginning in May 2016 and continuing through the present time, Menh combined, associated, agreed or acted in concert with others, including GWLF, for the express purpose of injuring Wolf in his business and reputation by tortiously interfering with Wolf's employment contract with Lebenthal and through the publication and republication of false and defamatory statements.  In furtherance of the conspiracy and preconceived joint plan, Menh orchestrated a scheme the unlawful purpose of which was to defame Wolf nationally and cause him to lose his job.  Acting in concert with others, Menh utilized a progressive news aggregator, email, text messages, the Internet and social media to publish, republish and spread the defamation and character assassination and to prosecute and pursue unfounded litigation.

56.     Menh acted intentionally, purposefully, without lawful justification, and with the express knowledge that she was injuring Wolf.

57.     Menh's actions constitute a conspiracy at common law.

58.     As a direct result of Menh's misconduct, Wolf suffered damage and loss, including, but not limited to, presumed damages and actual damages, loss of employment, injury to his personal and professional reputations, prestige and standing, court costs, and other damages in an amount to be determined by the Jury, but not less than $3,000,000.00.

Wolf alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.   He believes that substantial additional evidentiary support, in the exclusive possession of Menh and her clients, agents and other third-parties, including Speaker of the House Paul Ryan, Treasurer of GWLF and Trump PAC Great American Founder, Backer (formerly founder of www.dbcapital.com now principal of www.political.law), CEO of Americans for Prosperity Tim Phillips, Koch PS Senior Executive Phil Ellender, The Townsend Group, PAC California Victory 2018, former Senator Ted Cruz advisor and Stonington Global lobbyist, Nicolas Muzin, and others to be determined, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Wolf reserves the right to amend this Complaint upon discovery of additional instances of Menh's tortious interference, defamation and conspiracy.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, August Wolf respectfully request the Court to enter Judgment against Samantha Menh as follows:

A.     Compensatory damages in an amount to be determined by the Jury, but not less than $3,000,000.00;

B.     Punitive damages in the amount of $350,000.00 or the maximum amount allowed by law;

C.     Prejudgment interest at the rate of 6% per year on the Principal Sum awarded by the Jury from June 14, 2016 to the date of Judgment;

D.     Postjudgment interest at the rate of six percent (6%) per annum until paid;

E.      Such other relief as is just and proper.

**TRIAL BY JURY IS DEMANDED**

DATED:      September 14, 2018

AUGUST LOUIS WOLF

By:___*/s/ Steven S. Biss*_____
          Steven S. Biss (VSB # 32972)
          300 West Main Street, Suite 102
          Charlottesville, Virginia 22903
          Telephone:     (804) 501-8272
          Facsimile:      (202) 318-4098
          Email:           **stevenbiss@earthlink.net**

          *Counsel for the Plaintiff*